# REPORT FOR

**Michael Hendryx, Esq.**
**Jason C. McLaurin, Esq.**
**STRONG PIPKIN BISSELL & LEDYARD, L.L.P.**
**Houston, Texas**

## Concerning

**Domco Products Texas Inc., As Successor-In-Interest To Uvalde Rock Asphalt, Inc. v. The Continental Insurance Company, As Successor-In-Interest To Harbor Insurance Company, Civil Action No. 4:12-cv-02072, In The United States District Court For The Southern District Of Texas, Houston Division**

**October 2013**

**Donald S. Malecki, CPCU**
**MALECKI DEIMLING NIELANDER & ASSOCIATES, LLC**
**Erlanger, Kentucky**

## PURPOSE OF REPORT

The purpose of this report is to explain, based on my understanding of the facts, that:

(1) products liability coverage was being provided by Employers Casualty Company prior to its insolvency, and continues to be covered by the Harbor Insurance Company, which issued umbrella policies above the general liability policies issued by Employers Casualty Company.

(2) despite the inability to locate most of the policies written by Employers Casualty Company of Texas, Harbor Insurance Company had, and continues to have, no reasonable basis for delaying a decision on determining or denying coverage under its umbrella policies.

## BASIS OF REPORT

This report is based on my 53-plus years of experience in the insurance and risk management industry as a broker, consultant, author, archivist-historian, teacher, insurance company underwriter and insurance company claims consultant. A copy of my most recent curriculum vitae accompanies this report as **Exhibit 1**.

The books I have authored, co-authored, and served as a contributing author are listed in my curriculum vitae. My articles, by title only, and publications comprise **Exhibit 2**.

I have testified in over 50 trials and approximately 500 depositions in both state and federal courts in the past 30 years on custom and practice, the evolution, rationale and intent of property and casualty insurance policies and provisions. **Exhibit 3** consists of a list of my depositions and trial testimony for the past four years. My fee is $500 per hour, plus reasonable expenses, regardless of the outcome of this case.

The documents that were reviewed and serve, in part, as the basis of my professional opinions in this matter are listed in **Exhibit 4**.

I wrote a letter on September 18, 2012 regarding this matter, concerning why Exclusion (Named Insured's Products) G 319, attached to the Employers Casualty Insurance

Company's primary liability policy, has no application in this matter. That letter is incorporated in this report and attached as **Exhibit 5**.

## NATURE OF INSURANCE EXPERT TESTIMONY

Based on my professional experience in the insurance and risk management industry, I have come to learn that in permitting expert testimony on insurance matters, courts want to know from someone who has worked in the "trenches," about the evolution and rationale for various insurance provisions pertinent to the issues being litigated. Also, the courts often want to know the role of various insurance company operations, such as underwriting, loss prevention and control, and claims handling.

Courts do not want to know what legal opinions or conclusions an expert has to offer, if any, since these should be left to the attorneys of the respective parties to introduce and argue and for the courts to decide. However, as a teacher and consultant, I am constantly consulted by persons, such as insurance buyers of various public and private entities and students of the business, who want to know about the history, application of coverage, and the rationale for provisions, including exclusions and kindred matters in furthering their understanding of the intricacies of the insurance and risk management industry.

## DESCRIPTION OF FACTS

Domco seeks umbrella liability coverage from Continental for the period 1978-1981, because of numerous lawsuits alleging bodily injury resulting from exposure to asbestos products manufactured or sold by Uvalde Rock Asphalt Company and/or Azrock Industries, Inc. The primary liability layers of general liability insurance are no longer available in light of insurer insolvencies.

Employers Casualty was providing Uvalde Rock Asphalt Company and/or Azrock Industries, Inc. a defense for these product liability suits until this insurer was deemed to be insolvent. Following insolvency, Domco paid for all defense costs and indemnity that would have been paid by Employers Casualty in order to exhaust the policy limits. Now

that the Employers Casualty Company policies have been exhausted, Domco is seeking to access such monies from the Harbor policies. Domco had the right to make up the difference between what Employers Casualty paid and what was left to be paid under Employers Casualty's policies, based on the Loss Payable provision in Harbor's umbrella policy. This Loss Payable provision states, in part, that "Liability under this Policy with respect to any occurrence shall not attach unless and until the Insured or Insured's underlying insurer shall have paid the amount of the underlying limits. . . ."

Resolute, on behalf of Continental Insurance, so far has avoided paying any of Domco's 13 claims. Its position, since 2009, is that it cannot say whether or not its policies provide products liability coverage. Particularly, Resolute contends that since Domco has not provided the underlying policies, or sufficient proof that the underlying Employers Casualty policies provided products liability coverage, its policies do not cover products liability coverage. Curiously, Resolute asserts that such a position is not a denial of coverage.

Although Domco has not been able to locate copies of the Employers Casualty primary general liability (CGL) policies for the period 1978-1981, there is sufficient evidence to make clear that the Employers Casualty CGL policies had products liability coverage. Further, as the policies of Harbor Insurance also provide umbrella liability protection, they provide coverage for products liability, even if the primary policies do not.

### OPINIONS

### The Forms of the Underlying Employer's Casualty Policies Issued from 1978 to 1981

Employers Casualty Insurance Company provided comprehensive general liability insurance to the two predecessor companies of Domco Products Texas, Inc. (Domco) for decades. Domco cannot locate copies of several of the Employers Casualty Company policies issued to its predecessors, including the policies issued for the period of July 1978 through July 1981. Fortunately, Domco has been able to locate a policy that Employers Casualty Company issued to Domco's predecessors for the time period between 1982 and 1983. This is an important find, because the policy form utilized by

Employers Casualty between 1982 and 1983 is the same as the policy form that Employers Casualty utilized between 1978 and 1981.

All of the liability policies Employers Casualty issued from January 1973 to September 1, 1987 consisted of standard language and provisions drafted by the Insurance Services Office (ISO). The Texas Department of Insurance confirmed this fact. During this time-period, ISO, which was then a non-profit organization, offered a variety of services to insurance companies, such as statistical, actuarial, manual rules, and the drafting of policy provisions. When ISO drafts policy provisions, it also seeks approval on behalf of all insurers from the insurance departments in all states. These provisions are referred to as "standard," since the provisions are the same for all insurers. Standard forms offer many advantages. For example, when premium and loss statistics are compiled from a variety of insurers using the same form, they form a meaningful basis for rate adjustments. Also, the provisions of two or more standard forms applying to one business are more compatible and less likely to create nonconcurrencies of coverage or so-called "coverage gaps" than a mix of standard and nonstandard forms written for one business. The use of standard forms also simplifies the selling of insurance.

### Harbor Insurance Company Charged For and Provided Products Liability Coverage

Numerous documents produced in discovery reveal that Harbor Insurance Company provided Products Liability coverage to Domco's predecessors. One document that verifies the inclusion of products liability coverage is the insurance application prepared by the named insured and its insurance representative.  The insurance applications also consisted of questions about products, such as the annual sales and receipts and a description of the products exposures.  If it were not the intent of Harbor to have covered products liability, asking those questions would have been unnecessary.

The way the premiums of the Harbor umbrella policies were determined also signifies that the underlying Employers Casualty policies covered products liability. If one notes carefully the Swett & Crawford application (CON 000111), the agent requested that the

5

umbrella premium be a certain price. In one year, the figure was $9,000. In the insurance business, this is called "backing into the price or premium." It means that if the insurer will price its umbrella policy for that price, it will be acceptable to the policyholder.  When backing into a price, the underwriter seldom wants to know much about the prospective insured other than who the primary insurer is, the nature of the liability policy, e.g., comprehensive general liability (CGL) policy, amount of payroll and sales-receipts, limits, and loss history. The underwriter is not interested in looking at the specific coverages of the CGL policy, since the underwriter (1) knows what the standard coverages of admitted insurance companies (licensed by the state) provide, and (2) applies a retained limit when the umbrella policy is to apply to exposures not covered or excluded by the primary policy.

What is also very telling that the Harbor policies provided products liability coverage is the so-called Coding Breakdown.  These documents, customarily handled by the underwriting departments and  generally unfamiliar to insurance company claims personnel, are used to allocate the premiums for a variety of purposes, such as for taxes, reinsurance, and rate-making. The first one in the underwriting file is Bates Number CON 00081. Looking at this particular document, note that the Umbrella charge for Products Liability claims involving bodily injury is 10 percent of the bodily injury premium applicable to the primary policy. Property damage is 30 percent, meaning that the Harbor underwriter viewed property damage claims involving Products Liability to be more serious than bodily injury claims. It also reveals that 40 percent of the umbrella policy premium charge was devoted to products liability. A similar coding document is CON 000194 for policy year commencing on July 1980 under policy number HI 148066. In that year, the percentage for Products Liability bodily injury claims was 15 percent of the primary CGL bodily injury premium. In any event, the fact that Harbor took into consideration 10 percent of the underlying bodily injury premium of the CGL policy issued by Employers in calculating the flat premium charge unquestionably evidences that the Harbor not only was providing Products Liability coverage but also charging Uvalde Asphalt for it.

6

Another important document is the so-called Policy Information Reference (PIR), which is a document utilized by the claims department to give an overview of the important characteristics of policies involved in claims. The one written for the Harbor umbrella policy commencing on July 1, 1978, is on page CON 000034. Note on the second page of this document, CON 000035, that the Products exclusion is not designated but the Pollution exclusion is.  The PIR for the Harbor umbrella policy year commencing on July 1, 1979 appears on CON 000117-118 and reflect that this policy was the same as the preceding one. Likewise, the PIR for the policy year beginning on July 1,1980 is located at CON 000132-133. This last one did not note any of the exclusions, products or pollution, the latter presumably because asbestos was determined not to be subject to the pollution exclusion and required, instead, a separate exclusion.

<h2 style="text-align:center">Contractors Limitation Endorsement</h2>

Continental Insurance Company takes the position that the Harbor umbrella liability policies do not provide products coverage, unless such coverage was provided by the underlying Employers Casualty policies. Continental reasons that the Contractors Limitation Endorsement of the Harbor umbrella policies provides that: ". . . except insofar as coverage is available to the  insured in the underlying insurance as set out in the attached schedule this insurance shall not apply: 1. To Products and Completed Operations. . . ."

The purpose for a Contractors Limitation Endorsement of the kind attached to the Harbor umbrella policies, although having no application regarding this matter for reasons as noted, is intended to transform umbrella coverage for construction contractors to excess liability policies. Insurers that include these endorsements, in other words, do not want to issue as broad of coverage as is commonly provided by an umbrella liability policy.

Further, examination of the Contractors Limitation Endorsement HU 8295 reveals that the language used therein is inconsistent with the language of the Harbor policies in question. In particular, the Harbor umbrella policies define certain terms that appear in upper case and lower case. For example, the terms "Products Liability" and "Named

Insured's Products" are both defined in the Harbor umbrella policies. When these terms appear in the policy, one refers to the definitions section to determine the meaning as the term appears in the policy provisions. Referring to the Contractors Limitation Endorsement, note that it refers to the word PRODUCTS, which is neither in quotes nor signifies in any way that it is a defined term.

As one who teaches and writes about insurance, it is my understanding that one of the purposes of an endorsement is to modify the policy provisions in some way. The question is how the Contractors Limitation Endorsement, which refers to the undefined term PRODUCTS can modify or have any relationship with the Harbor Policy's defined term "Products Liability." Harbor's policy does not explain what it means by its reference to the undefined word PRODUCTS in the Contractors Limitation Endorsement. So, the meaning of the endorsement's reference to PRODUCT is anyone's guess. For sure, the word "PRODUCTS' means anything but "Products Liability," which is defined in the Harbor policies.

Finally, the Contractors Limitation Endorsement is meant to exclude contracting risks where certain coverages are particularly troublesome, unless candidates for this endorsement maintain separate insurance covering these risks. In this case, however, neither Uvalde Asphalt nor Azrock has ever been in the contracting business. They were strictly distributors (wholesalers) of floor tile and never installed the products they sold. They, therefore, are not subject to the Contractors Limitation Endorsement, which was improperly included for purposes of this policy.

Based on the foregoing explanation, there is no reasonable basis for Harbor Insurance Company's reliance on the Contractors Limitation Endorsement as a reason for denying coverage, or delaying the determination of coverage.

### It Does Not Matter Whether the Underlying Policies
### Provide Products Liability Coverage—The Umbrella Policy Is Activated

In his deposition of August 28, 2013, Micah Inlow of Resolute Management testified that he did not know the difference between an umbrella policy and an excess policy. This is

8

shocking for someone who works for an entity involved in handling claims, dealing with umbrella policies.

Harbor Insurance Company issued umbrella liability policies that applied over the primary liability policies issued by Employers Casualty Company. Before discussing the purpose of an umbrella policy and the reasons coverage applies in this matter, it is first necessary to briefly discuss the characteristics of an excess liability policy.

## Characteristics of An Excess Liability Policy

An excess liability policy, in custom and practice, is intended to provide excess limits of coverage above the limit of underlying liability policies. As such, an excess policy provides no broader protection than that provided by the underlying liability coverages. When the limits of an underlying liability policy are exhausted, the excess liability policy continues in force, meaning it takes over and continues to provide coverage as if the excess policy were the underlying policy.

An excess liability policy can take three forms:
(1)  Follow form. The provisions of the excess policy contain the same provisions as the underlying policies. In the event of a conflict between the excess and primary policies, the primary policy provisions control.
(2)  Conditional follow form. The excess policy follows the underlying policies but has, to some extent, its own provisions.  In the event of a conflict, the provision of the excess policy controls.
(3)  A  combination of the above two policies. In other words, where the excess policy incorporates the primary policy provisions and then embellishes on them.

In this case, the excess coverage part of the Harbor umbrella liability policies is of the second kind, a conditional follow form.

## Characteristics of An Umbrella Liability Policy

An umbrella liability policy is a type of excess liability coverage that not only provides additional limits, like an excess policy, but also provides coverage when such coverage is not available in the underlying policies, subject to the assumption by the named insured of a retained limit. The distinguishing feature of an umbrella policy is coverage that is broader than the underlying liability policies, thus providing coverage that is not otherwise provided by the underlying policies. This is unlike a liability policy that provides only excess liability coverage, which does not cover that which is excluded by underlying policies.

Thus, while umbrella policy provisions vary, they nonetheless perform three basic functions:

(1)  Provide additional limits above the limits of the primary liability policies.

(2)  Continue in force as if the umbrella policy were an underlying liability policy after the latter's aggregate limits are reduced or exhausted.

(3)  Cover some claims not covered by underlying policies, subject to a retained limit, commonly referred to as a "self-insured retention."

The latter two functions are commonly referred to as "drop down coverage."

A review of the Harbor umbrella policies issued to Uvalde Rock Asphalt Company reveals that they are "true" umbrella policies. Under the Insuring Agreements, paragraph 2. Limits of Liability, it reads as follows:

> The Company hereon shall only be liable for the Ultimate Net Loss, the excess of either
> (a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances; or
>
> (b) $25,000 Ultimate Net Loss in respect of each occurrence not covered by said underlying insurance (hereinafter called "underlying limits");
>
> and then only up to a further sum as stated in Item 2(a) of the Declarations in all in respect of each occurrence—subject to a limit as stated in Item 2(b) of the Declarations in the aggregate for each annual period during the currency of this Policy, separately in respect of Products and Completed Operations Liability and

10

in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Insured.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this Policy, subject to all terms, conditions and definitions hereof, shall

    (1)  in the event of reduction pay the excess of the reduced underlying limit;

    (2)  In the event of exhaustion continue in force as underlying insurance.

The inclusion or addition hereunder of more than one Insured shall not operate to increase the company's limit of liability beyond those set forth in the Declarations.

Note: Terms appearing in these policies in caps and lower case signify they are defined in a special section of these policies.

Even if, for the sake of argument, products liability coverage was not afforded by the underlying comprehensive general liability policies, the Harbor umbrella  policies would "drop down" and continue protecting the insureds, subject to a retained limit of $25,000 each occurrence. That is one of the purposes of this kind of policy.

When products liability coverage applies under a primary liability policy, it is a condition of many umbrella policies that these policies do not become payable until the limits of the underlying policy are exhausted. Some umbrella policies specify that the umbrella policy is activated only after the underlying insurer has paid its underlying limit. Other insurers, however, are more generous and state, as does the Harbor Insurance Company, that the policy is activated whether it is the insurer or insured who has paid the underlying limit. This is explained under the policy's Loss Payable provision, which reads in part: "Liability under this Policy. . . shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of underlying limits on account of such occurrence. . . ."

With Domco's continued payment of indemnity and legal costs, following the insolvency of Employers Casualty Company, the underlying policies' aggregate limits were

11

exhausted. This, as a result, activated the second part of the Harbor policies' insuring agreement, which reads in part: "In the event of. . . exhaustion of the aggregate limit of liability under said underlying insurance by reason of losses paid thereunder, this Policy. . . shall (2) in the event of exhaustion continue in force as underlying insurance." This means in no uncertain terms that the umbrella policies continue in provide coverage just as if they were the primary policies. This is important because, when a primary general liability policy provides defense and other legal costs in addition to limits, the umbrella policy continues to provide that payment procedure as well.

## The Prior Insurance and Non Cumulation Condition

The Harbor umbrella policy contains a condition on page 4 of 5 titled: "Prior Insurance and Non Cumulation of Liability, which reads:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the insured prior to the inception date hereof, the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

This kind of condition was first introduced by London underwriters in 1960. The insurers' ultimate goal for this kind of provision is to limit coverage for progressive injury or damage attributable to a single occurrence to a single per-occurrence limit, even where the injury or damage occurs over several policy periods.

However, it does not apply to all umbrella policies because these provisions can be quite confusing. For example, insureds would be obligated to pay for protection they would never fully receive, and would not learn this after reading the exclusions and limitations of the Policy but, instead, after a covered claim or suit occurs.

It is my understanding that each of the underlying claims is considered to be a separate occurrence. This condition would have no application since, as mentioned, it is used in situations involving a single occurrence transgressing over more than one policy period.

## Claims Practices of Harbor Insurance Company

Continental Insurance Company maintains that it has not yet denied coverage, despite knowing about this situation since 1981, being informed in 2007 that Domco would soon exhaust its underlying liability policy limits, and being informed in 2009 that the primary limits of Employers Casualty Company had been exhausted. It was at this juncture that Domco also sought payment from Harbor for both indemnity and legal costs.

At the time Domco made payments sufficient to exhaust the underlying Employers Casualty Company policies, Continental's obligation to provide products liability insurance to Domco was reasonably clear. This is apparent for several reasons.

First, when it is notified of a claim or suit, an umbrella insurer evaluates the chances its layer of insurance may become payable. It does this to set reserves in light of its reinsurance commitments. In fact, an insurer has an obligation to notify its reinsurer, just like a policyholder's obligation to notify its insurer. Failure of an insurer to notify its reinsurer can put its coverage in peril.

The umbrella insurer also has to monitor how the underlying insurer is progressing. The insurer here may obtain its information from the primary liability insurer or from  the policyholder. Whatever the case may be, monitoring is important, since the umbrella insurer needs to adjust its reserves according to what it sees as the chances of its having to be called upon to  pay claims.

While Harbor may not have been particularly worried about providing defense until the primary limits have been reduced or exhausted, it still would or should have continued monitoring how the primary insurer was proceeding in this regard, particularly since the umbrella policy had no solvency provision precluding coverage when Employers Casualty Company became insolvent. At the time the underlying primary policy limits were paid by either Employers Casualty Company or Domco, Continental's umbrella policy was triggered and its obligation to pay commenced under the Harbor umbrella policies.

In support of its refusal to render a coverage decision, Continental reasons that it is impossible to verify whether the umbrella policies provide products liability coverage, unless it can be demonstrated that the underlying Employers Casualty Company policies provided products liability coverage. Continental's position, in this regard, is not only quite unreasonable but also too late. As mentioned in this report, Continental not only knew the underlying policy of Employers Casualty provided products liability for the damages claimed, but also charged Domco's predecessors for that coverage.

Upon my review of the file, I came across extensive evidence demonstrating that the underlying insurer indemnified and defended Domco against products liability claims and lawsuits. In addition, Harbor/Continental sent several reservation of rights letters in 1981, 2009, 2010 and 2011, which omitted any mention of products coverage being barred under the primary policies. Finally, and more importantly, I reviewed an Employers Casualty Company primary policy issued to Domco for the period 1982-1983. By almost all indications, this  policy provided virtually identical coverage as the Employers Casualty Companies policies that provided coverage below the Harbor policies. In effect a mere two years after the Harbor policies were issued, this Employers Casualty Company primary policy clearly provides products liability coverage. This Employers Casualty policy, by the way, contains the same policy structure and wording as policies first issued from 1973 until replaced in Texas in 1987.

In his deposition, Micah Inlow admitted to considering none of the above factors, all of which should have compelled a person handling the claims of this matter to conclude that the underlying Employers Casualty Company policies provided products liability coverage. In some small attempt to support his actions, Mr. Inlow testified that he would have liked to have seen the primary insurer's underwriting documents and manuals. However, this statement makes no sense, given that underwriters of umbrella policies, in custom and practice, do not require copies of underlying policies in order to price and issue umbrella policies, and would have no reason for requesting the primary insurer's underwriting documents.

14

Further, even if the underlying Employers Casualty Company policies did not provide products coverage, the Harbor policies would provide coverage under the umbrella portions of those policies. As noted in prior sections of this report, the Contractors Limitation Endorsement does not apply to exclude products claims because (1) the named insured was not a contractor (and the broker's [Swett & Crawford] umbrella application question 10 confirms that fact); (2) the reference to the term PRODUCTS in the endorsement is incomprehensible; and (3) the umbrella portion of the Harbor policies provide broader coverage than the excess coverage portion of those policies.

It is apparent that Continental did not even consider the umbrella coverage provided by the Harbor policies in its coverage determination. In his deposition, Mr. Inlow, who was in charge of adjusting Domco's claims, admitted that he had no idea what the difference was between an umbrella policy and an excess liability policy, and did not understand the relevant features of those types of policies. One can certainly question why a person with no knowledge of these types of policies would be placed in charge of determining coverage under an excess/umbrella policy. Given this lack of knowledge, it is not surprising that Continental failed to correctly evaluate coverage under the policy and took the unreasonable position that it would refuse to provide coverage, unless the underlying Employers Casualty Company policies were not found.

Under the circumstances, no reasonable claims person should have needed copies of the underlying policies to determine if coverage is provided under the Harbor policies: (1) because the umbrella policy provides products coverage, regardless of the coverage provided by the underlying Employers Casualty Companies; and, (2) because the underlying Employers Casualty Company policies clearly provided coverage for products liability required in this matter.

Insurance companies investigate claims. In determining whether an insurance company like Harbor performed a reasonable investigation, one can look at the history of communication between the insured and the insurance company.

15

In this instance, Domco first communicated with Harbor in 1981 when it gave notice that it had been sued for products liability. Harbor reviewed copies of the lawsuits and sent Domco a letter dated July 14, 1981 indicating that Harbor's policies may not provide coverage for punitive damages. DOMCO/HAR 000531. Of importance, this letter did not raise any issue or hint that there may not be products liability coverage. Further, the letter stated that because it expected that there would be more claims in the future, the letter would serve as notice to Domco for all asbestos claims.

In 1985, Domco communicated with Harbor regarding another asbestos lawsuit. DOM/HAR 000536. It informs Harbor of the person at Employers Casualty responsible for the case. This letter from Domco's (Azrock's) President makes clear that it expects coverage under the Harbor policies. This communication was years before Employers Casualty Company went into receivership in 1994. Had anyone at Harbor wanted to investigate whether Employers Casualty provided products liability coverage and/or wanted a copy of the policies, that avenue was open and available.

Then in 2007, Domco informed the insurer's claim representative, Gabriel Slominski, that the limits of the underlying policy of Employers Casualty Company would soon be exhausted. Certainly, what would have been a reasonable investigation of this matter should have begun no later than this date. At this time, the insurer should have requested what information it thought was necessary to position itself into continuing coverage as if it were the underlying insurer. If Harbor had a question on coverage, it could have sought the advice of a Harbor or Continental underwriter. Underwriters often are excellent sources for assistance having to do with coverage and policy structure. It was not until 2009 that Continental requested certain information having to do with allocation, loss runs, and kindred documents. It is important to note that the reservation of rights letter issued in 2009, CON 001263, never mentioned anything about products liability coverage being a problem.

During the period between 1981, when Domco gave Harbor notice of the lawsuits and 2012 when Mr. Micah Inlow had a reservation of rights letter issued dealing with a

16

question on products liability coverage, Domco was never informed of any problem having to do with products liability. Domco most assuredly was led to believe throughout all of these years that the idea of having paid premiums for insurance would provide the peace of mind it sought as it faced one claim after the other.

It actually was too late for Continental to issue a reservation of rights letter having to do with a question on products liability coverage in August 2012, 31 years after the notice of the two lawsuits. What Mr. Inlow could have done, given the correspondence dated as far back as 2002, from Domco notifying Continental that the Employers Casualty Company primary policies could not be located, was to consider the secondary evidence. He testified in his deposition that this evidence might have been helpful. For example, he testified in his deposition on page 77 that as part of his investigation, he did not consider whether the premium charged by Harbor included products liability. He said it could possibly be secondary evidence. As acknowledged by Mr. Inlow, himself, there are numerous other sources of secondary evidence he could have considered, but did not.

In my professional opinion, Harbor and/or Continental Insurance Companies did not conduct a reasonable investigation having to do with products liability coverage under the Harbor umbrella liability policies. In all of the reservation of rights letters issued, it is not until 2012 that coverage is first questioned. There are sufficient ways to confirm that Harbor has been obligated to pay the products liability claims under its umbrella policies. Further, Harbor's continued reliance on the Contractors Limitation Endorsement (which does not apply) as the sole basis for questioning coverage at this late time is unreasonable. In addition, failing to affirmatively accept or deny coverage is unreasonable conduct in the claims handling process.

I reserve the right to supplement this report, if review of additional documents so warrant.

17

Respectfully submitted,

MALECKI DEIMLING NIELANDER & ASSOCIATES, LLC

Donald S. Malecki, CPCU
Principal